**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**at PIKEVILLE**

**CIVIL ACTION NO. 05-382-DLB**

**JASON CORNETT, JR.**                                                    **PLAINTIFF**

**vs.**                 **MEMORANDUM OPINION & ORDER**

**MICHAEL J. ASTRUE, Commissioner**
**SOCIAL SECURITY ADMINISTRATION**                         **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of an administrative decision of the Commissioner of Social Security. The Court, having reviewed the record and for the reasons set forth below, hereby reverses and remands the Commissioner's decision.

### I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Jason Cornett, Jr. filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) payments on January 14, 2004. (Tr. 51-53, 330-32)  Plaintiff alleges he became unable to work on August 31, 2003, due to his limited education and problems with his knees and herniated discs in his back. (Tr. 61)  Plaintiff's applications were denied initially (tr. 37-40, 334-37) and on reconsideration (tr. 42-44, 339-41).  He requested a hearing before an ALJ, which was held by video conference on May 9, 2005, in Lexington and in Hazard, Kentucky. (Tr. 342-78)  On August 23, 2005, ALJ Paris ruled that Plaintiff was not entitled to DIB or SSI benefits. (Tr. 16-25)  This decision became

the final decision of the Commissioner when the Appeals Council denied review on September 30, 2005. (Tr. 8-10)

On November 28, 2005, Plaintiff filed the instant action. The matter has culminated in cross motions for summary judgment, which are now ripe for review.

## II. DISCUSSION

### A. Overview of the Process

Judicial review of the Commissioner's decision is restricted to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *See Cutlip v. Secretary of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994). "Substantial evidence" is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Courts are not to conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *See id.* Rather, we are to affirm the Commissioner's decision, provided it is supported by substantial evidence, even if we might have decided the case differently. *See Her v. Comm'r of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999).

The ALJ, in determining disability, conducts a five-step analysis. Step 1 considers whether the claimant is still performing substantial gainful activity; Step 2, whether any of the claimant's impairments are "severe"; Step 3, whether the impairments meet or equal a listing in the Listing of Impairments; Step 4, whether the claimant can still perform her past relevant work; and Step 5, whether significant numbers of other jobs exist in the national economy which the claimant can perform. As to the last step, the burden of proof shifts from the claimant to the Commissioner. *See Jones v. Comm'r of Social Security,* 336

F.3d 469, 474 (6th Cir. 2003); *Preslar v. Sec'y of Health & Human Servs.,* 14 F.3d 1107, 1110 (6th Cir. 1994).

**B.     The ALJ's Determination**

At Step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 17) At Steps 2 and 3, the ALJ found Plaintiff's problems with his left hand, his status post old prior closed head injury, his left knee problems, and his chronic back pain to be severe impairments, along with borderline intellectual functioning and adjustment disorder with depressed mood. (Tr. 18)  However, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments severe enough to meet or medically equal any listed impairment in Appendix 1, Subpart P, Regulation No. 4. (*Id.*)

At Step 4, the ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform a significant range of light exertional work; that is, lifting and/or carrying 20 pounds occasionally and 10 pounds frequently.  The ALJ further concluded that Plaintiff can stand and walk for up to six hours, or sit for up to six hours in an eight-hour workday.  He is, however, limited to only occasional climbing of stairs and ramps, stooping, bending, kneeling, and crouching.  Occupationally, he can never climb ladders, ropes, or scaffolds, or crawl.  And he is restricted from repetitive handling (gross manipulations) with his left hand. (Tr. 20) From a mental status standpoint, the ALJ concluded that Plaintiff is borderline intellectual functioning and has an adjustment disorder secondary to his medical condition.   He nevertheless, per the ALJ, has the mental capacity to understand, remember, and carry out simple oral instructions and maintain the necessary concentration for two-hour intervals to complete such tasks.  He can also adequately relate to others in

3

an object-focused work environment and tolerate the changes and pressures of a routine work setting. (*Id.*) The ALJ determined that given his RFC, Plaintiff could not return to his past relevant work in a saw mill and as a scoop and shuttle car operator, a belt man in underground mining, and a roof bolter. (Tr. 22)

The ALJ therefore proceeded to the final step of the sequential evaluation. At Step 5, the ALJ found there were a significant number of jobs available to Plaintiff in both the national and regional economies despite his limitations. (Tr. 23) This conclusion resulted from testimony by a vocational expert (VE), in response to a hypothetical question assuming an individual of Plaintiff's age (33 at the time of the hearing and so a "younger" individual), education (limited), past relevant work experience (semi-skilled but non-transferable), and RFC. The VE testified that Plaintiff could be employed at the light exertional level as a vehicle cleaner, parking lot attendant, or inspector. (Tr. 375) Since these were positions of significant number in both the regional and national economies, the ALJ concluded Plaintiff was not disabled under the Social Security Act. (Tr. 24)

**C.    Analysis**

Plaintiff advances two primary arguments on appeal. One, that the ALJ failed to consider whether he meets or medically equals Listing 12.05(C). And two, that the ALJ's hypothetical to the VE failed to adequately reflect his limitations and restrictions resulting from his mental impairments. After review of the administrative record, the Court concludes that both of these points are well-taken and necessitate remand of this matter.

<u>Listing Impairment</u>. Plaintiff contends the ALJ erred by failing to consider whether his claim evidences that he meets or equals Listing 12.05(C) - mental retardation. Section 12.05 of the Social Security regulations sets forth the requirements that a claimant's

condition must satisfy to be eligible for benefits based, in part or in whole, upon a claim for mental retardation.  20 C.F.R. Pt. 404, Subpart P, Appx. 1 § 12.05.  If a claimant meets or medically equals the criteria of a listing and meets the durational requirement (20 C.F.R. §§ 404.1509 and 416.909), the claimant is automatically disabled regardless of age, education, and work experience.  *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).

Mental retardation under Listing 12.05 refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.  To meet Listing 12.05(C) specifically imposes upon the claimant the burden to show that his impairment satisfies the following diagnostic description:

    (1)    significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22;

    (2)    a valid verbal, performance, or full scale IQ of 60 through 70; and,

    (3)    a physical or other mental impairment imposing an additional and significant work-related limitation of function (i.e., is a "severe" impairment(s) as defined in §§ 404.1520(c) and 416.920(c)).

20 C.F.R. Pt. 404, Subpart P, Appx. 1 § 12.05(C).

In his appeal, Plaintiff does not seek for this Court to evaluate and determine whether he meets this Listing.  Rather, he asks for remand so that the ALJ can make this assessment.  Indeed, review of the ALJ's decision reflects that, to the extent he considered whether Plaintiff met a listed impairment, he focused upon Listings 12.02 (organic mental disorders) and 12.04 (affective disorders).  Plaintiff submits the psychological and other evidence supports consideration of Listing 12.05(C), had that evidence been adequately and properly evaluated by the ALJ.  Based on review of the record, the Court is persuaded

that Listing 12.05(C) should at least have been examined in the course of ALJ's sequential analysis.

Psychologist Michele Amburgey performed a consultative psychological evaluation in April, 2004 at the agency's request. (Tr. 273-77) Her diagnostic impression was that of mild mental retardation based upon the testing administered to Plaintiff. (Tr. 276) But the ALJ rejected Psychologist Amburgey's opinions. He instead gave "great weight" to the opinions of Psychologist Robert Spangler (tr. 18, 21), whose opinions were based upon his psychological testing done six months later, in October of 2004. (Tr. 319-27) Plaintiff's IQ scores were higher on this later testing, and the diagnostic impression of Psychologist Spangler at Axis II was that of borderline intelligence rather than mild mental retardation as opined by Psychologist Amburgey. (Tr. 322)

The ALJ's consideration of the mental impairment evidence raises questions on whether his determination that Plaintiff did not meet a listed impairment is supported by substantial evidence. For example, the ALJ rejected Psychologist Amburgey's impressions. (Tr. 21) But the ALJ accorded "great weight" to the opinions of Edward Stodola, Ph.D. (tr. 18), the nonexamining consultant who completed a psychiatric review technique form (PRTF) and mental residual functional capacity assessment (MRFC). (Tr. 280-98) Yet Psychologist Stodola himself assigned "great weight" to Psychologist Amburgey's evaluation, which was made available to him and which he used in the course of completing the PRTF and MRFC. (Tr. 296)

In addition, not noted or discussed by the ALJ, but pointed out by Plaintiff, are inconsistencies in Psychologist Stodola's submissions. The consultation request sent to Psychologist Stodola contains a May 12, 2004, handwritten note inquiring "Is the

6

[claimant's] physical impairment severe? If yes, we can meet 12.05C. Low intelligence & EMH [educable mentally handicapped] placement noted in the school records.[1] Please obtain a physical consultation as needed." (Tr. 298)[2] According to the record, Psychologist Stodola then on May 14, 2004, completed a PTRF and an MRFC, on which he notes listing categories 12.02 and 12.04. (Tr. 280) There is no explanation in the record or discussion in the ALJ's decision of this change from Psychologist Stodola's handwritten comment that claimant meets Listing 12.05C if a severe physical impairment exists to the conclusions he noted on the PTRF and MRFC. Nor does the Commissioner in his brief address this confusion in Psychologist Stodola's records raised by Plaintiff. Given that the ALJ placed great weight upon Psychologist Stodola's findings, and Psychologist Perritt adopted those findings, at least some clarification of these remarks is appropriate and warranted.

Thus, the testing by Psychologist Amburgey, the agency consultant, resulted in scores supportive of a mild mental retardation diagnosis. The testing by Psychologist Spangler resulted in scores supportive of borderline intellectual functioning. The ALJ gave

---

[1] Plaintiff's school records are part of the record in this case. (Tr. 93-177) This reference by Psychologist Stodola to Plaintiff's school records and Plaintiff's intellectual capacity and cognitive functioning as reflected therein presumably relates to that part of Listing 12.05(C)'s requirement that a claimant show "significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22." The Commissioner notes in his brief that the school records also reflect IQ testing in 1982 by Dr. George Tapp resulting in a full scale IQ of 77, performance IQ of 73, and verbal IQ of 84. (Tr. 129) More pertinent to the Court's analysis herein is that neither this specific piece of evidence, nor the other evidence of evaluation and placement decisions during Plaintiff's school years, was ever considered by the ALJ to determine whether "significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22" had been demonstrated, because Listing 12.05(C) itself was not considered.

[2] The record reflects that the following day, May 13, 2004, a physical consultation request was directed to Dr. S. Mukherjee. That same date Dr. Mukherjee writes that based on review of the 4/15/04 medical evaluative report of Dr. Bobby J. Kidd, claimant has no physical impairments other than to certain fingers of his left hand, and opined that his physical condition therefore was less than severe. (Tr. 278)

7

"greater weight" to these latter IQ scores. The ALJ reasons that the borderline intelligence reflected on the later testing is more consistent with the overall record than is the mild mental retardation reflected on the earlier testing because Plaintiff 1) has a long working history in mining; 2) has custody of his three children and is their primary caretaker; 3) functions independently; and 4) has well-developed math skills. (Tr. 21) But, as also pointed out by Plaintiff, these are not sound reasons to reject Psychologist Amburgey's testing and conclusion of mild mental retardation.

Relying upon *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268 (6th Cir. 1991), Plaintiff points out the Sixth Circuit's recognition in *Brown* that "virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments[.]" *Brown,* 948 F.2d at 270 (quoting the description of mild mental retardation as stated in the *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1987)(DSM-III-R)). Such a degree of functional ability does not negate that an individual is mildly mentally retarded. *Id.*

The functional abilities pointed out by the ALJ herein are similar to those pointed out by the court in *Brown* as not being inconsistent with mild mental retardation. Brown was able to "achieve social and vocational skills adequate for minimum self-support" as provided in the DSM-III-R, in that he worked as truck driver, kept records and read maps; and functioned somewhat independently in housekeeping duties and grocery shopping, with the ability to make change. *Id.* at 269-70. Similarly, Plaintiff herein worked many years in manual labor jobs in the mines, jobs classified as industry-specific, semi-skilled work though not requiring significant cognitive abilities. His primary caregiver role for his children is borne from sheer necessity, given that the children's mother left. (Tr. 274, 368)

And he is assisted in caring for his children, housekeeping and maintenance, and money management by his immediate family members, who live close by. (Tr. 321, 361-62) As for the ALJ's reference to "well developed mathematic skills" this may have been observed in the conclusions section of Psychologist Amburgey's report. (Tr. 276) The record otherwise does not support that he has strong math skills. His evaluative testing by both psychologists evidenced math skills at the fourth grade level (tr. 275, 322), and Psychologist Spangler reported his sister takes care of bill-paying for him and recommended a third-party payee if funds are awarded (tr. 321).

Thus, the "record as a whole" evidence on Plaintiff's functioning relied upon by the ALJ as supporting borderline intellectual functioning rather than mild mental retardation does not necessarily support such a conclusion, as recognized in *Brown.* And nor does the Commissioner in his dispositive filing distinguish or otherwise address the application of *Brown* to Plaintiff's circumstances here. The reasoning of *Brown* casts doubt on the ALJ's reliance upon such functioning as substantial evidence to negate consideration of mild mental retardation.

Moreover, in his decision the ALJ rejects the mild mental retardation conclusion of Psychologist Amburgey as being inconsistent with Psychologist Spangler's test scores "obtained *only* six months later when *valid* mental test results placed the claimant in the borderline intellectual functioning range." (Tr. 21)(emphasis added) This does not, however, serve as a basis to reject the earlier scores. The ALJ emphasized the validity of the Spangler scores. But both psychological examiners state they believe the results to be valid. (Amburgey, tr. 274 - "He seemed able to concentrate and pay attention and the results are considered valid." Sprangler, tr. 321 - "The obtained scores are considered a

valid and reliable estimate of Mr. Cornett's abilities and achievement levels at this time.")[3] The ALJ emphasizes the six-month time frame between testings as evidencing the invalidity and explaining the inconsistency of the earlier results, whereas Plaintiff points to the differences in the later test results as being *caused by* the six-month interval. In other words, Plaintiff challenges the ALJ's conclusion that the later results are valid because the fact that retesting was done within six months, in and of itself, places the accuracy of those results in issue.

On this point, Plaintiff contends that retesting within short time frames can produce artificially inflated results. He submits that rather than simply concluding the results were valid on their face, the ALJ should have recognized this possibility and employed a medical expert to address the reliability of those scores.[4] The Commissioner does not dispute the psychological field's recognition that temporal factors can be relevant in assessing the validity of IQ testing. Indeed, the Commissioner provides reference authority from the SSA's *Program Operations Manual System* (POMS) explaining what is essentially the "margin of error" used for results of psychological/psychometric retesting done within various time periods. However, applying these principles to the latter testing, submits the

---

[3]The regulations also require that "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and degree of functional limitation." 20 C.F.R. Pt. 404, Subpart P, Appx. 1 § 12.00(D)(6)(a). While both psychological evaluators indicated the scores obtained were considered valid, neither expressly stated whether they were consistent with the Plaintiff's developmental history and degree of functional limitation.

[4]The Court notes that while Psychologist Spangler remarked the scores are considered valid and reliable, there is nothing within that report that reflects he was aware Plaintiff had been tested six months earlier and given the opportunity to comment whether this was relevant to his conclusions. And since Psychologist Spangler evaluated Plaintiff at the request of his counsel, there is no agency consultation request or other transmittal form reflecting whether he was apprised of the prior testing as part of the background information on the case.

Commissioner, still does not place those test results in the same numerical range reported by Psychologist Amburgey and corresponding with mild mental retardation. The Commissioner contends it was therefore appropriate for the ALJ to rely upon the results reported by Psychologist Spangler's testing and unnecessary for him to seek expert opinion evidence to resolve the conflicts in the reported test results.

The fact remains that, while both parties make commendable efforts to explain how the time interval between testings could impact subsequent test scores, the ALJ did not note or perhaps recognize that testing within this six-month period could impact those results. He did not refer to or otherwise mention this POMS and its application as a basis for understanding or weighing the scores reported by Psychologist Spangler. Application of this process might place those latter results in a more accurate light. This type of interpretation and processing of such critical medical evidence is not something that should be done at the first instance by an appellate court. Rather, it is more appropriately considered and explained by the medical experts and consultants and/or the ALJ in conjunction with consideration of the substantive merits of the claim. Contrary to the Commissioner's implied suggestion, the Court does not view its role as one of determining the extent to which the POMS may or may not impact the evaluative test scores, then using that determination to see if the ALJ's failure to do so was harmless because scores higher than those earlier reported were still achieved. And even if the Court were so inclined, it still would not explain why the earlier results of Psychologist Amburgey – results given great weight by Psychologist Stodola – are not valid or credible. These are considerations best left to the ALJ in the first instance.

<u>Cognitive Limitations</u>.  That this action should be remanded for further consideration of whether Plaintiff meets or medically equals Listing 12.05(C) has already been determined.  But should the ALJ at remand find that the requirements of Listing 12.05(C) are not satisfied, the claim would proceed with the remainder of the sequential analysis; namely, an RFC determination and consideration of past relevant or other available work based thereon.  20 C.F.R. §§ 404.1520(e)-(g) and 416.920(e)-(g).  Should that occur, Plaintiff also challenges the adequacy of the non-exertional limitations determined by the ALJ.  In light of this possibility, a few observations relative to this challenge are appropriate.

With respect to Plaintiff's residual functional capacity from his mental impairments, the ALJ found as follows:

> The claimant is borderline intellectual functioning and has an adjustment disorder secondary to his medical condition, however, he has the mental capacity to understand, remember, and carry out simple oral instructions and maintain the necessary concentration for two hour intervals to complete such tasks.  He is able to adequately relate to others in an object-focused work environment and to tolerate the changes and pressures of a routine work setting.

(Tr. 20) In his presentation of hypotheticals to the VE, the ALJ conveyed this same information. (Tr. 375)

Determination of a claimant's RFC is, of course, within the charge of the ALJ, not the medical experts.  This includes a claimant's RFC from mental impairments.  20 C.F.R. §§ 404.1546 and 416.946.  But an ALJ does not determine such in a vacuum.  Rather, the determination must be supported by substantial medical and other record evidence.  *Id.* §§ 404.1545 and 416.945.  Moreover, an RFC is presented in terms of the most a claimant can still do, despite his limitations.  *Id.* §§ 404.1545(a)(1) and 416.945(a)(1).

The above-quoted abilities noted by the ALJ match the remarks of Psychologist Stodola in the functional capacity assessment section of the MRFC he completed. (Tr. 296) The ALJ indicated he placed great weight on both nonexamining psychologists' opinions. Setting aside the fact that Psychologist Stodola indicates he gives great weight to the evaluation of Psychologist Amburgey, an evaluation the ALJ does not adopt, both nonexamining psychologists opined other limitations that were not adopted or otherwise addressed by the ALJ. These limitations were driven by their assessments that Plaintiff presents with an adjustment disorder with depressed mood (category 12.04) and an organic mental disorder (category 12.02) of "mild mental retardation by current testing." (Tr. 281, 283, 302, 304) They each noted that an RFC assessment was necessary. (Tr. 280, 301) And each opined that Plaintiff's mental residual functional capacity to 1) understand and remember detailed instructions, 2) carry out detailed instructions, 3) maintain attention and concentration for extended periods, 4) interact appropriately with the general public, and 5) respond appropriately to changes in the work setting were all moderately limited. (Tr. 294-95, 314-15) To some extent it is reasonable to deduce the ALJ believed these assessments sufficiently incorporated within the abilities he did determine; however, noticeably missing within those is any reference to Plaintiff's abilities to deal with the public.

Moreover, though the ALJ indicated that he gave great weight to the opinions of Psychologist Spangler (tr. 18), his evaluation occurred after Psychologists Stodola and Perritt offered opinions. The extent to which their conclusions would be impacted by this later evaluation is unknown. More importantly, Psychologist Spangler is an examining consultant. In addition to providing his diagnostic impression of borderline intelligence, he completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form

13

reflecting his opinions on Plaintiff's limitations and restrictions from his borderline intelligence. These include "good" ability to follow work rules, relate to co-workers, interact with supervisors, deal with work stresses, maintain attention and concentration, follow simple job instructions, maintain personal appearance, and behave in an emotionally stable manner; "good to fair" ability to relate predictably in social situations; "fair" ability to use judgment with the public, function independently, and demonstrate reliability; "fair to poor or no" ability to deal with the public, and follow detailed, but not complex, job instructions; and "poor or no" ability to follow complex job instructions. (Tr. 325-27) Although the ALJ indicates he gives Spangler's opinions great weight, he does not include these opinions in the RFC itself or otherwise note them or explain what weight, if any, he gives them and why. The regulations provide that "[u]nless the treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, *as the [ALJ] must do for any opinions from* treating sources, *nontreating sources,* and other nonexamining sources who do not work for us." 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2)(emphasis added).

In presenting hypotheticals to the VE, an ALJ is also to place them in the context of an individual having, among other things, like education. Here, in his written findings the ALJ notes simply that Plaintiff has a "limited education" (tr. 24) which is defined as:

> . . . ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. §§ 404.1564(b)(3) and 416.964(b)(3). While Plaintiff testified that his formal education was completion of the eighth grade, he was also placed in special ed classes for most of his schooling. (Tr. 350, 370) The testing by the evaluating psychologists reflected that Plaintiff reads at the first or second grade level and has fourth grade math skills. (Tr. 275, 322) Indeed, one of Psychologist Spangler's diagnostic impressions was that Plaintiff is functionally illiterate (tr. 322), defined in the regulations as an individual who "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. §§ 404.1564(b)(1) and 416.964(b)(1).

The details of Plaintiff's educational status were not included by the ALJ in either the RFC or his questioning of the VE. In his hypothetical questioning to the VE, the ALJ did not present any educational background specifics.[5] It was the VE who, in response, incorporated the ALJ's direction by stating "[y]ou basically have a young individual with an eighth grade education, some of it being in special ed...." (Tr. 375) This was the extent to which the VE accounted for education as a vocational factor in identifying jobs available to Plaintiff.

This presentation was insufficient to accurately reflect Plaintiff's educational background. The regulations dictate that a numerical grade level is used *unless* there is evidence contradicting a claimant's formal education as representative of actual educational abilities. 20 C.F.R. §§ 404.1564(b) and 416.964(b). Here, there was substantial, uncontradicted evidence reflecting Plaintiff's educational abilities were

---

[5]The question posed by the ALJ was "Based on the same hypothetical, giving consideration to the limitation and restrictions set out therein and additionally giving consideration to vocational factors, that being age, education and past relevant work, would there be jobs available to him in the national or regional economy and if so could you give examples?" (Tr. 375)

15

significantly different from his formal education.  *See Skinner v. Sec'y of Health & Human Servs.,* 902 F.2d 447, 450-51 (6th Cir. 1990)("a numerical grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist").

There are unpublished Sixth Circuit decisions upholding an ALJ's incorporation, in more general terms, of a claimant's educational limitations beyond the claimant's numerical grade level.  *See, e.g., Hammond v. Apfel,* 2000 WL 420680 (6th Cir. Apr. 12, 2000) (unpublished table decision)(even where ALJ erred in failing to instruct VE that claimant who could read on only a first grade level was considered illiterate rather than of limited education as was instructed by the ALJ based on claimant's eleventh grade formal education, Sixth Circuit concluded ALJ nevertheless adequately instructed in hypothetical by identifying claimant has borderline intellectual functioning and specifically is limited to very simple reading); *Chandler v. Sec'y of Health & Human Servs.,* 1994 WL 669670 (6th Cir. Nov. 29, 1994)(unpublished table decision)(ALJ's hypothetical to VE which asked VE to assume a person with claimant's age, education, experience, RFC, and physical limitations was not erroneous despite the fact it did not identify that claimant, who was diagnosed with borderline intellectual functioning and a developmental reading disorder, was functionally illiterate nor did the question specify that claimant would be restricted to simple, repetitive, low-stress work, as the VE was aware of these conditions due to claimant's own testimony).  But in this case, the ALJ's description cannot be viewed as otherwise properly outlining Plaintiff's cognitive abilities, even from a general standpoint. At best, the ALJ's notation that Plaintiff is limited to simple oral instructions might give rise to the inference that he has reading difficulties, but it says nothing about Psychologist

16

Spangler's impression that he is functionally illiterate or that he has writing, spelling, and math limitations beyond his formal education.

The Commissioner responds generally that the ALJ's RFC and hypotheticals adequately included those limitations from Plaintiff's mental conditions deemed credible. But as noted above, there were various functional limitations opined by Psychologists Stodola and Spangler not incorporated in the RFC or otherwise addressed by the ALJ in his decision, apart from stating he gives their opinions great weight. Nor does the Commissioner address the education argument in particular, or the *Skinner* case.

Under these circumstances, the hypothetical formulated by the ALJ as presented to the VE did not accurately convey the nature and extent of Plaintiff's non-physical restrictions. Consequently, the ALJ's reliance upon the VE's responses thereto cannot provide the requisite substantial evidence to support his conclusion that Plaintiff is not disabled. Again, this Court will not speculate on what impact the limitations and restrictions opined but not addressed by the ALJ would have upon Plaintiff's RFC, or the impact that providing appropriate educational vocational information would have on the VE's opinion testimony concerning available jobs. This analysis is left to ALJ on remand, should the case proceed to steps four and five of the sequential analysis.

### III. CONCLUSION

Accordingly, for the reasons stated,

**IT IS ORDERED** that the decision of the Commissioner is found not to be supported by substantial evidence and is hereby **REVERSED,** with this action **REMANDED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. #13) is hereby **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. #10) is hereby **GRANTED.**

A Judgment reversing and remanding this matter will be entered contemporaneously herewith.

Dated this 19th day of March, 2007.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\SocialSecurity\MOOs\7-05-382-CornettMOO.wpd